IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL SEMIAN<br>728 Parrott Avenue<br>Scranton, PA 18504<br><br>                              Plaintiff,<br><br>         v.<br><br>DEPARTMENT OF MILITARY AND<br>VETERANS' AFFAIRS-GINO J.<br>MERLI VETERANS' CENTER<br>401 Penn Avenue<br>Scranton, PA 18503<br><br>                              Defendant. | NO:<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff  Michael Semian, ("Plaintiff" or "Semian") by and  through his  undersigned counsel, Harry T. Coleman, Esquire, hereby  brings this civil  action  against  Defendant  Department  of  Military  and  Veterans' Affairs – Gino J. Merli Veterans Center ("Defendant" or "Veterans' Center"), stating as follows:

## PARTIES

1.      Plaintiff, Michael Semian, is a resident of Pennsylvania residing at the above address. Plaintiff formerly worked, at all relevant times, as the Commandant/ Administrator at the Veterans' Center from June 2010 to October 2015.

2.      Plaintiff is, and has been, a Licensed Nursing Home

Administrator in the Commonwealth of Pennsylvania.

3.     Plaintiff is a gay male and at the time of his termination was forty-seven years of age with a date of birth of August 22, 1968.

4.     Plaintiff is a 1990 graduate of Marywood University in Scranton having obtained a Bachelor of Arts Degree in Health Services Administration.

5.     Plaintiff holds licensure as a Pennsylvania Licensed Nursing Home Administrator which he obtained in 1994.   At the time of his licensing, the *Scranton Times* noted that the Plaintiff was the youngest person to obtain certification within the Commonwealth.

6.     In 1991 the Plaintiff was hired at the former Moses Taylor Hospital as an Assistant Coordinator for Community Outreach Programming.

7.     The Plaintiff worked as the Assistant Administrator for the United Methodists Homes for the Aging from 1993 to 1998.

8.     In 1994 the Plaintiff was promoted to the position of Administrator of Tunkhannock Manor, a forty-two unit personal care home operated by the United Methodist Homes for the Aging.

9.     In 1998, the Plaintiff was hired as the Assistant Administrator for the Diocese of Scranton Little Flower Manor, a one hundred and thirty

three bed skilled nursing facility with a sixty unit assisted living component and was responsible for over three hundred employees. The Plaintiff had the distinction of being the first lay Administrator in the twenty-six year history of the facility.

10.     In 2008 the Plaintiff accepted the position of Administrator of the Wilkes Barre General Hospital's skilled nursing unit.

11.     In 2010, after an exhaustive interview process the Plaintiff was approved by former Governor Ed Rendell as the Commandant of the Gino Merli Veterans' Center in Scranton.

12.     Plaintiff worked for the Defendant as Commandant/Administrator at the Veterans' Center from his appointment in June of 2010 to his separation in October of 2015.

13.     The Defendant is a department of the Commonwealth of Pennsylvania, with a place of business at the above address.

14.     Defendant Commonwealth of Pennsylvania ("Commonwealth") is the party that maintains the Department of Military and Veterans' Affairs ("Department") and its divisions and sub-divisions.

15.     The Department of Military and Veterans' Affairs was established by the Pennsylvania Legislature to administer the healthcare system for Commonwealth Veterans.

16.    The Mission Statement for the Department is: "to provide advice and assistance to Pennsylvania's more than 894,000 Veterans and their families and to provide quality care to aging Veterans."

17.    The Department, through its facilities, provides a broad spectrum of personal care, skilled nursing care, domiciliary care, and dementia care for eligible Veterans who served in the armed forces of the United States of America.

18.    The Veterans' Center opened in January 1994 as the Northeastern Veterans' Center and was the first newly constructed home for veterans within the state system.

19.    In July 2002, the Veterans' Center was renamed the Gino J. Merli Veterans' Center in honor of the noted World War II hero and Medal of Honor recipient from Lackawanna County.

20.    The Veterans' Center provides 196 beds, including 156 for full nursing care and 40 for dementia. The Nursing Care Unit provides 24-hour care, seven days a week, providing resident veterans a complete range of clinical services under the direction of physicians and other health care professionals.   The Dementia Unit provides veteran residents long-term care in a safe and secure environment.

21.    At all times relevant hereto, the Defendant acted by and

through its agents, servants, and employees, each of whom acted within the scope of his or her job duties.

22.    Defendant is an "employer" within the meaning of Title VII of the Civil Rights Act because it engaged in an industry affecting interstate commerce and because it maintains fifteen (15) or more employees for each working day in each of the twenty (20) or more weeks in the current or preceding calendar year.

23.    The Defendant also maintains a sufficient number of employees to satisfy the jurisdictional prerequisites of the Pennsylvania Human Relations Act ("PHRA") requiring four or more employees.

## JURISDICTION AND VENUE

24.    This Court has original jurisdiction with respect to the claims against Defendants pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

25.    Venue is proper in this jurisdiction under 28 U.S.C. § 1391.

## PROCEDURAL AND ADMINISTRATIVE REMEDIES

26.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set

forth at length.

27. The Plaintiff has satisfied the procedural and administrative requirements for proceeding under the Title VII as follows:

    a.    the Plaintiff filed a timely written charge of discrimination (No. 201503318) against the Defendant with the Pennsylvania Human Relations Commission("PHRC") alleging employment discrimination;

    b.    On or about January 31, 2017, the PHRC issued a Notice of Right to Sue to the Plaintiff (See Exhibit "A" attached hereto);

    c.    The instant action is timely filed;

    d.    The Plaintiff also cross-filed the afore-mentioned charges of discrimination with the United States Equal Employment Opportunity Commission("EEOC").

28.   The Plaintiff has exhausted his administrative remedies as to the allegations of this Complaint.

## **FACTUAL ALLEGATIONS**

## **PLAINTIFF AS COMMANDANT/ADMINISTRATOR**

29.    As stated, Plaintiff was the Commandant/Administrator at the Veterans Center from June of 2010 to October 2015.

30.    During his employment with the Defendant, Plaintiff was responsible for the development and oversight of a twenty-six million dollar annual operating budget.

31.    During his employment with the Defendant, Plaintiff was responsible for managing, directing, and controlling all services for the 196 bed skilled nursing and sixteen unit personal care facility.

32.    During his employment with the Defendant, Plaintiff was responsible for the oversight of over 320 employees.

33.    The Plaintiff, during his employ, was responsible for managing the facility's six labor relations programs and implemented management contractual obligations while simultaneously maintaining harmonious and productive relationships with Union representatives and all employees.

34.    During his employ, Plaintiff acted as a liaison with national, state, and community healthcare organizations.

35.    During his employ, Plaintiff established and maintained policies to enable the facility to comply with federal and state standards of nursing homes.

36.    During his employ, Plaintiff was responsible for

interpreting policies, goals and philosophies of the geriatric field for state, federal and local elected and appointed officials.

## PLAINTIFF'S ACCOMPLISHMENTS DURING TENURE AT VETERANS' CENTER

37.    During the Plaintiff's tenure as Commandant, the Plaintiff was responsible for developing and implementing compliance rounds that were recommended to be standard procedures in the other five Veterans' homes in the Commonwealth of Pennsylvania.

38.    During the Plaintiff's tenure as Commandant, the Plaintiff was responsible for developing and implementing Monthly Mission Meetings to encourage communication and give leadership and coaching techniques.

39.    During the Plaintiff's tenure as Commandant, the Plaintiff was responsible for developing and implementing administrative weekend coverage utilizing all department heads.

40.    During the Plaintiff's tenure as Commandant, the Plaintiff developed a new nursing organizational structure after the Director of Nursing retired in 2014, following a lengthy leave of absence. This proposed organizational structure was never implemented at the Scranton Veterans' Center due to the delay attributed solely to the Department whose offices were located at Fort Indiantown Gap.

41. While Commandant at the Veterans' Center, Plaintiff was responsible for increasing revenue by three hundred and fifty thousand dollars ($350,000.00) by analyzing and recommending conversion of the focus from personal care to skilled nursing care.

42. During the Plaintiff's tenure as Commandant, the Plaintiff was responsible for improving quality of care at the Veterans' Center by hiring a full time Certified Registered Nurse Practitioner (CRNP). A CRNP is a registered nurse with advanced training in diagnosing and treating illness. CRNPs prescribe medications, treat illness, and administer physical exams. CRNPs focus on prevention, wellness, and education.

43. During the Plaintiff's tenure as Commandant, the Plaintiff was responsible for suggesting and hiring another assistant Director of Nursing in order to provide better coverage at the facility. However, as discussed below, a majority of time prior to the Plaintiff's separation of employment, the Plaintiff operated without the benefit of a Director of Nursing (DON).

44. During the Plaintiff's tenure as Commandant, the Plaintiff was responsible for developing and implementing two sensory stimulation rooms for resident Veterans with dementia.

45.   For six consecutive quarters, Plaintiff was recognized and acknowledged by the Department as being the Administrator of the top nursing facility within the Department with the best revenue recovery.

46.   During the Plaintiff's tenure as Commandant, he was responsible for a successful marketing program that increased interest and stabilized the facility's census by seventy five percent.

47.   During the Plaintiff's tenure as Commandant, the Plaintiff was responsible for cutting over-time cost by implementing a bank account employment system in December of 2014.

48.   While the Commandant at the Gino Merli Facility, the Plaintiff was responsible for stabilizing union-management relations to a point where monthly labor-management meetings were reduced.

49.   During the Plaintiff's tenure as Commandant, he implemented programs and awareness that reduced employee incident and accident rates by one hundred and ten percent.

50.   During the Plaintiff's tenure as Commandant, he developed a program, "Coffee with the Commandant" that was held each month with each shift in order to stress communications among the entire staff.

51.   During the Plaintiff's tenure as Commandant, he developed and installed elopement drills and elopement monthly meetings to insure

Veteran patients with a mental disorder or cognitive impairment remain in a safe area of the facility.

52.    During the Plaintiff's tenure as Commandant of the Merli Facility, he received Appraisal letters from the Pennsylvania Department of Health that recognized the Merli Facility's reduction of anti-psychotic drug use on the Veteran residents.

## NURSING LEADERSHIP SHORTAGES AT THE VETERANS' CENTER

53.    In late 2012 a nurse who served as the Infection Control and Wound Nurse became ill and retired.

54.    In 2013 the then Director of Nursing placed an inexperienced individual into the position as Infection Control and Wound Nurse. The Director of Nursing wanted to give this individual a break from the floor nursing duties due to some work issues he was experiencing.

55.    In 2013, the CRNP left her employment and no CRNP was replaced until 2015.

56.    The replacement CRNP, in 2015, raised questions and concerns regarding survey related issues and these issues were brought to the attention of the Department's Director of Homes and Medical Director of Homes by the Director of Nurses (DON). Issues developed to the point

where directives were given by the Director of Homes to both the DON and the Plaintiff not to have the CRNP attend any meetings with the Surveyors of the Department of Health because the CRNP would "kill us" during the survey process. The Plaintiff protested this approach.

57.     In 2013, after a Department of Health survey, the DON went on medical leave.

58.     Following the departure of the DON, as described previously, there was no continuity in that position.  From August of 2013 to September of 2014, the DON position was filled by utilizing several employees including the Assistant Director of Nursing, a Nursing Supervisor, and a Quality Assurance Director from the Department.

59.     In May of 2014, the DON returned to work for less than thirty days and then formally retired from the Gino Merli Veterans' Center.

60.     The search for a new DON began and the selected DON began her position four months after her predecessor's retirement, in September of 2014.

61.     At the time a replacement DON was sought, it was discussed with all applicants that the Gino Merli Veterans' Center was operating under a Provisional II License, discussed more fully below, from the Pennsylvania Department of Health.

62.    During 2013 when the former DON was out on medical leave, up to and including the tenure of the replacement DON through the separation date of the Plaintiff in October of 2015, as many as three representatives from the Department Headquarters in Fort Indiantown Gap were physically present in the Gino Merli Scranton Facility almost weekly to provide analysis and guidance during the Provisional II to Provisional III Licensing process, as discussed below.

63.    In late summer 2015 the Director of Homes for the Department, the Medical Director of Homes and another individual had a meeting with the Director of Long Term Care for the Department of Health in Harrisburg to question her on the tactics of the Department of Health Inspectors and to share with her that the Merli Facility had witnesses to the microscopic nitpicking of the activities at the Gino Merli Veterans' Center by the Surveyors.

## DEPARTMENT OF HEALTH SURVEYING AND LICENSING PROCESS.

64.    The Department of Health and Human Services conducts an inspection and rating of Veterans' homes throughout the Commonwealth.

65.    Nursing homes are commonly referred to as nursing care facilities or long term care facilities according to the Pennsylvania Department of Health. The Department of Health, which inspects nursing

homes annually, has been given the responsibility of inspecting Pennsylvania's nursing homes by the federal Centers for Medicare and Medicaid Services.  These inspections are called surveys.  The Department of Health conducts surveys in nursing homes with a survey team to insure that the facilities are following state and federal rules and regulations.

66.    In 2013, the Annual Survey of the Merli Center revealed several issues and identified that the male wound nurse, discussed above, did not have an understanding of the position and was unable to perform the duties of his position.  The Director of Homes and the Medical Director of Homes decided that this male nurse would be placed back on a less hectic nursing unit. A registered nurse, with only seniority of position, would ultimately serve in the position of Infection Control and Wound Nurse for the Gino Merli Facility.

67.    The female nurse selected by the Department for the position of Infection Control and Wound Nurse lacked formal training or experience in wound care or infection control.  The Plaintiff questioned this appointment.

68.    Following the appointment of this new Infection Control and Wound Nurse, the Gino Merli Facility continued to get cited with issues regarding infection control and wounds.

69.    The Department, following these citations, decided that an

outside wound company could assist with the issues presented. It was anticipated to have this outside Company at the Merli Facility a few days a week.  The Company, selected by the Department with no input from the Gino Merli DON or the Plaintiff, as Commandant, was on site merely one day per week.

70.   The Gino Merli Facility continued to meet the standards of wound care over the next two health surveys which placed the Facility into Provisional II License status.

71.   The Plaintiff continuously complained to his superiors at the Department that a competent and effective DON and Infection Control and Wound Nurse was critical to the health care needs of the resident Veterans at the Gino Merli Facility.

72.   Ten surveys were conducted of the Merli Center in 2014.

73.   Seven surveys were conducted of the Merli Center in 2015 prior to the Plaintiff's separation from employment.

74.   On information and belief, the shortcomings in the Department of Health Surveys of the Gino J. Merli Veterans' Center centered upon infection control and wound control.

75.   In December 2015, the Pennsylvania Department of Health downgraded the Veterans' Center License to the lowest of the four

provisional levels resulting from resident care issues at the Scranton Facility.

76.   The Department of Health provided the services of a "temporary manager" in an effort to bring the Merli Facility back into regulatory compliance and get its regular license restored.

77.   The Department of Health issued the Merli Facility a six-month Provisional IV License on December 20, 2015 when its previously issued Provisional III License expired.

78.   A Department of Health Survey completed September 25, 2015 identified several areas where the Facility was not in compliance with the Department of Health requirements.   These deficiencies were overwhelmingly in the area of infection disease and wound care.

## PLAINTIFF'S ANNUAL EVALUATIONS.

79.   From 2010 through 2013, the Plaintiff was evaluated under the direction of Director of Homes, Paul Cain.  Plaintiff's evaluations always exceeded expectations.

80.   Subsequent employee evaluations conducted by the new Director of Homes, Andrew Ruscavage were also positive.

81.   An Interim Evaluation covering the period from February 2013, through June 2013, read as follows:

**LEADERSHIP:** "has made many improvements and identifies problems before they affect operations."

**PLANNING**: "exceeds expectations. He guides the home and he is very proactive at getting in front of problems and fixes them before they escalate."

**MANAGEMENT:** "Exceeds expectations." "He has improved relations between labor and management and Mr. Semian has an approach to the management of funds that results in success."

**PERSONAL RELATIONS**: "Exceeds expectations." "Commandant is very good at sharing knowledge and information during a problem to increase the chance it will be resolved quickly."

**RESULTS:** "Meets expectations." "Commandant Semian has an innate ability to set strategic direction and manage others to meet the organizations goals, results from residents families and bereavement surveys have been positive for the facility."

**OVERALL RATING**: "Exceeds expectations." "Mr. Semian has exceeded expectations and I have every confidence that he will perform at the highest level in this environment, he is developing processes to eliminate deficient practice."

82.   An Interim Evaluation covering the period from July 2014 through January 2015, read as follows:

**LEADERSHIP**: "Meets expectations." "Commandant Semian has shown much improvement in the areas of leadership of Gino Merli." "He has developed and implemented monthly mission meetings to stimulate leadership and management staff in the facility."

**PLANNING:** "Copes well with problems beyond his control."

**MANAGEMENT**: "Meets expectations." "Commandant Semian

has increased his efforts in changing the climate of the home, his monthly meetings are indicative of theses attempts at change. He uses time and resources effectively by organizing people and resources with efficiency and success."

**INTERPERSONAL RELATIONS**: "Meets expectations." "The feedback that the Commandant provides his subordinates and coworkers has been essential in how the team has improved over this period of time since last review."

**RESULTS:** "Needs improvement." "Commandant Semian has had success with challenging the way things are done within the organization to come up with new and improved policies, plans and prioritize goals with quality of care for the residents in mind." "Satisfaction surveys from residents and families have been positive and shows the home in a good light."

**OVERALL RATING**: "Needs improvement." "Commandant Semian has shown vast improvement from last rating, elimination of deficient practices through corrective action plans with follow up." "The Commandant established monthly mission meetings that are bringing change to the culture of the organization." "Commandant Semian has the experience and knowledge to lead Gino Merli, he has a clear sense of what is required for the success of the Home." "He has become a change agent for the organization and his attitude is an asset to his management skills dealing with difficult situations with incredible posture."

83.     An Interim Evaluation covering the period from July 2014 through June 2015, four months prior to the Plaintiff's separation from employment read as follows:

**LEADERSHIP:** "Meets expectations." "Commandant Semian has made great strides in the development of the organizations leadership through monthly meetings designed to create a culture of change in the home." "**The benefits are being seen not only by the daily performance of the staff, but by the**

18

**positive change that has been identified by regulatory agencies during routine inspections at the home**." (Emphasis added).

**PLANNING:** "Meets expectation." "Commandant Semian is skilled at dealing with people at all levels."

**MANAGEMENT**: "Meets expectation." "Climate change is evident within the home, this has been spearheaded by Commandant Semian and change is a focus area in which he uses time and resources appropriately in the homes management."

**RESULTS:** "Needs improvement." "Commandant Semian has had success with challenging the way things are done within the organization to come up with new and improved policies, plans and prioritized goals all with quality of care for the residents in mind. "**The organization has cleared the DOH Plan of Correction and is awaiting annual inspection**." (Emphasis Added).

84.   Despite the above Evaluations, on October 25, 2015 the Pennsylvania Department of Military and Veterans' Affairs forwarded Plaintiff correspondence advising him of his separation from employment. (See Exhibit "B" attached hereto).

85.   On information and belief, the Plaintiff's separation from employment was due, in part, to his sexual orientation as he was made a "scapegoat" for the failures of the Department in meeting the Plaintiff's requested staffing requests for the Gino J. Merli Veterans' Facility that he proudly and competently led during his tenure of employment.

## COUNT I
## TITLE VII SEXUAL ORIENTATION DISCRIMINATION

86.    All of the allegations contained in the forgoing paragraphs of this Complaint are incorporated herein as though the same were set forth herein at length.

87.    The foregoing actions by the Defendant constitute unlawful discrimination against the Plaintiff on the basis of his sexual orientation.  As acting afore-said, the Defendant subjected the Plaintiff to disparate treatment on the basis of his sexual orientation.

88.    In acting as afore-said, the Defendant subjected the Plaintiff to negative treatment to which similarly-situated hetero-sexual employees were not subjected and/or treated similarly-situated hetero-sexual employees in a more favorable manner.

89.    The Defendant, by and through its agents, subjected the Plaintiff to adverse employment action as a result of his sexual orientation.

90.    The Defendant terminated the Plaintiff's employment because of his sexual orientation and did not terminate the employment of similarly-situated hetero-sexual employees.

91.    In fact, Defendant treated similarly-situated hetero-sexual employees more favorable, for example, when it replaced Plaintiff with a hetero-sexual male.

92.    The foregoing conduct by Defendant constitutes unlawful sexual orientation discrimination against Plaintiff in violation of Title VII of the Civil Rights Act of 1964.

93.    As a result of Defendant's unlawful discrimination, Plaintiff has suffered damages as set forth herein.

WHEREFORE, Plaintiff seeks compensatory damages, attorneys' fees and costs as a result of the Defendant's conduct.

## COUNT II
## VIOLATIONS OF 42 U.S.C. § 1981

94.    All of the allegations contained in the forgoing paragraphs of this Complaint are incorporated herein as though the same were set forth herein at length.

95.    At all times relevant herein, Plaintiff maintained a contractual relationship with Defendant (i.e., an employment relationship).

96.    At all times relevant herein, Defendant acted by and through its agents, servants and employees to intentionally discriminate against Plaintiff as a result of his sexual orientation thereby denying him the benefits of the contractual relationship that he had entered into with Defendant by separating him for pre-textual reasons, subjecting him to harassment as a result of his sexual orientation, and terminating his employment for pre-textual reasons.

97.    Plaintiff has suffered damages as a direct result of Defendant's unlawful actions.

WHEREFORE, Plaintiff seeks compensatory damages, attorneys' fees and costs as a result of the Defendant's conduct.

## COUNT III
## PENNSYLVANIA HUMAN RELATIONS ACT

98.    All of the allegations contained in the forgoing paragraphs of this Complaint are incorporated herein as though the same were set forth herein at length.

99.    The foregoing actions of the Defendant constitute unlawful discrimination and retaliation in violation of the Pennsylvania Human Relations Act, 43 Pa. C.S.A. §951, *et seq.*

100. As a result of Defendant's unlawful conduct Plaintiff has suffered damages as set forth herein.

WHEREFORE, Plaintiff seeks compensatory damages, attorneys' fees and costs as a result of the Defendant's conduct.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PERSPECTIVE CONTRACTUAL RELATIONS

101. All of the allegations contained in the forgoing paragraphs of this Complaint are incorporated herein as though the same were set forth herein at length.

102. As a result of the afore-mentioned conduct of the Defendant, said conduct constitutes a tortious interference with Plaintiff's prospective contractual relationships and he has and will continue to suffer damages in the manner set forth herein.

103. Such damages are in excess of seventy five thousand dollars.

WHEREFORE, Plaintiff seeks compensatory damages, attorneys' fees and costs as a result of the Defendant's conduct.

## COUNT V
## VIOLATION OF PENNSYLVANIA WHISTLEBLOWER LAW
## (43 P.S. §1421, *et seq*)

104. All of the allegations contained in the forgoing paragraphs of this Complaint are incorporated herein as though the same were set forth herein at length.

105. Plaintiff is an "employee" for purposes of the Pennsylvania Whistleblower Law, 43 P.S. Section 1421, *et seq.* ("Whistleblower Law").

106. The Defendant is an "employer" for purpose of the Whistleblower Law.

107. At all relevant times, the Defendant received Medicare and Medicaid funds from the Pennsylvania Department of Health and Human Services.

108. The Whistleblower Law states in relevant part, "No employer

may…threaten or otherwise discriminate against or retaliate against an employee regarding the employee's compensation, terms, condition, location or privilege of employment because the employee…makes a good faith report…to the employer…[ov] an instance of wrongdoing…."

109. Plaintiff made good faith reports to his supervisors at the Defendant that the reduction in staffing, specifically the Director of Nursing and the Infection and Wound Control Nurse, were resulting in poor patient care the Veteran residents of the Gino J. Merli Veterans' Center.

110.  On information and belief, and at all times relevant, the Director of Homes and Medical Director of Homes for the Defendant were authorized to and did act as agents of the Defendant. The Defendant's termination of the Plaintiff's employment violated the Whistleblower Law. Defendant's violation of the Whistleblower Law caused Plaintiff to suffer economic and emotional distress damages.

WHEREFORE, Plaintiff Michael Semian, prays for:

A.    An award  to compensate Plaintiff for back pay for lost wages and benefits and front pay for denial of Plaintiff's expected future earnings;

B.    Compensatory damages for physical and emotional injuries, humiliation, and damage to his professional

reputation;

C.      Pre and post-judgment interest; and

D.      The costs of litigation, including reasonable attorney's fees

        and expert witness fees;

E.      The cost of litigation, including expert witness fees, and

F.      Such other relief as may be just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 5, 2017


                                LAW OFFICES OF HARRY T. COLEMAN

                        By:     /s/ Harry T. Coleman
                                Harry T. Coleman, Esquire
                                Attorney I.D. No. 49137
                                41 N. Main Street
                                3rd Floor, Suite 316
                                Carbondale, PA 18407
                                (570) 282-7440
                                *Attorney for Plaintiff*